STATE OF IOWA v. JOSEPH SNYDER, Appellant.

**Burglary:** IDENTITY OF DEFENDANT: SUFFICIENCY OF EVIDENCE. On a trial for breaking and entering a dwelling house in the night time, with intent to commit larceny, the evidence is reviewed and held insufficient to identify defendant as the person who committed the offense.

*Appeal from Cerro Gordo District Court.*— HON. CLIFFORD P. SMITH, Judge.

TUESDAY, MARCH 10, 1908.

THE defendant was tried on an indictment charging him with breaking and entering a dwelling house in the nighttime with the intent to commit larceny therein. There was a

trial to a jury, and a verdict of guilty, and from a judgment thereon, the defendant appeals.—*Reversed.*

*J. C. Robinson* and *Clark & Chambers,* for appellant.

*H. W. Byers,* Attorney General, and *C. W. Lyons,* Assistant Attorney General, for the State.

SHERWIN, J.— In the early morning of July 23, 1907, some one broke and entered the house of Carl Meyer and took therefrom certain articles of personal property. The intruder entered through a window in the lower story of the house by removing a window screen. After ransacking the lower part of the house, he went to the second story, and stepped to the door of the bedroom occupied by said Meyer. He remained there a moment, when, upon observing that he was discovered, he made a hasty exit from the house. The testimony of Meyer, who was the only one who saw the intruder, is substantially as follows:

The light that was burning down in the lower end of the hall some ten or twelve feet from my door was an electric, four candle power lamp. . . . The footsteps came right straight down to my door, so far as I could tell. . . . The fellow stepped up to the doorway, and stood there looking around into the room. I think he put his hands up to the door as he came, . . . and dropped them down, and partly turned his face or body. . . . That is, when I jumped out of bed, and started after him down the hall. . . . Of course I did not get sight of him again. . . . I saw him stand there in the door as long as eight or ten seconds, I should think. . . . I didn't see his face distinctly. He had on a dark colored slouch hat. . . . I know the height of the door. Figuring from that, he would be about five feet eight. He was slender, his hair seemed bushy, and he had his hat pulled down close to his ears. Of course, I got his full outline, the light shining on his back, but his features I could not distinguish on account of the light shining on his back.

After Mr. Meyer had testified as above, his attention was called to the defendant, and he was asked the following questions, among others: "From what you saw there, Mr. Meyer, what would you say as to the defendant here being the man you saw there?" To which he answered: "He is the same fellow I saw in the jail, and the general build, and his size, and all that is as close to the description of the man as I could tell." He was then asked: "How did the bushy hair on the man you saw there that night correspond with the hair of the defendant? A. Well, of course, he had his hat on. I could not tell just as to that. It seemed to me as if his hair was quite bushy, what I could see from his outline from the back of his head, the light shining on his back rather." This witness further testified on direct examination that another peculiarity about the man he saw in his house that night was that he was "very thin waisted and was slender."

We have given substantially all of the testimony of Meyer which in any way tended to identify the defendant as the man who was in his house on the night in question. On the following day a police officer of Mason City was over near the Iowa Central and Chicago-Milwaukee junction, and discovered the defendant some distance south thereof on the Iowa Central track traveling south. He followed him some little distance, when the defendant turned around and came back. The police officer called to him to halt, but he paid no attention to him, and started to run. After the police officer stopped chasing him the defendant stopped running, and soon thereafter went into a field adjoining the track where the evidence shows that he remained in hiding for some little time. Another police officer was then sent for, and upon his arrival at the junction the two officers, aided by a citizen, finally captured the defendant after he had led them a chase of half a mile or more. He did not willingly submit to arrest, and after his arrest he was searched by the officers, and they found on his person a small file, a small amount of

red pepper in a sack, and three keys; one of which was a skeleton key, another was a night latch key, and the third was a padlock key. Immediately after the arrest the police officer endeavored to have the defendant talk, but he persistently refused to do so. Even when told " you must be a thief or you would not have run like that," he still refused to talk, and, according to the testimony, " he just dropped his head down, and sat there."

We have now given substantially all of the testimony which can fairly be said to indicate guilt on the part of the defendant, and we are very decidedly of the opinion that a man should not be sent to the penitentiary on testimony no more clearly identifying him with the commission of a crime than does the testimony which we have recited. It may possibly be that the defendant is the man who broke and entered the house on the night in question, but every presumption of the law stands between him and conviction. He is presumed to be innocent until he is proven guilty beyond a reasonable doubt. It matters not if the man be a tramp or a man who may possibly be an outcast in other respects, whatever or whoever he is, he is just as much entitled to the full protection of the law as is any citizen. We do not mean to say that the trial court took any different view of this case, but we are abidingly convinced that it was in error in not granting the defendant a new trial. If the defendant had not attempted to run away when the police officers were after him, it would hardly be contended by any one that the testimony of Meyer was alone sufficient to sustain a conviction, and still the defendant did nothing more when the officers were after him than many men might have done under the same circumstances, who were doing nothing more serious than tramping or attempting to steal a ride on a passing train. Another circumstance insisted upon as indicating guilt was the possession of the skeleton key, but we hardly think it safe to give the circumstances much weight, because many reputable citizens are in possession of such keys, and

the further fact that whoever broke into the house in question went through a window, when, if the State's theory is correct, the defendant with his skeleton key need not have gone to the trouble of removing a screen window. All that it was necessary for him to do, if he were the party, was to use the key which the State claims he had for the purpose. The possession of red pepper by a man engaged in nomadic walking excursions over the country is not, in our judgment, a very serious matter.

Some complaint is made of the rulings on the introduction of evidence, but we find no error in any of these matters. As we have heretofore indicated, we think this judgment should be reversed because of the insufficiency of the evidence. It is therefore ordered accordingly, and the case will be remanded.— *Reversed.*